*Richard M. Egbert*
*Attorney at Law*

*Patricia A. DeJuneas*
*Admitted to practice in*
*Connecticut & Massachusetts*

*99 Summer Street*
*Suite 1800*
*Boston, Massachusetts 02110*
*Telephone (617) 737-8222*

*Telecopier (617) 737-8223*

January 31, 2007

Richard Rinaldi
U.S. Probation Officer
1550 Main Street, Room 212
Springfield, MA 01103-1422

RE:     United States v. Raymond Asselin
        04-CR-30033-MAP-1
        Objections to Presentence Report

Dear Mr. Rinaldi:

Enclosed please find our objections to your Presentence Report ("PSR") dated November 3, 2006.

**Paragraph 7**

Please note that Mr. Asselin retired in April, not May, of 2003.

**Paragraph 32**

Mr. Asselin never instructed staff at the Springfield Housing Authority ("SHA") to falsify records.

**Paragraph 64**

Mr. Asselin denies the allegations in Paragraph 64.

**Paragraph 80**

Mr. Asselin asks that Paragraph 80 be modified to reflect that the contract was split into an interior contract and an exterior contract because the project architect recommended doing so.

*Law Offices of Richard M. Egbert, P.C.*

**Paragraph 84**

Mr. Asselin asks that Paragraph 84 be amended to state that he did not have control over the Davis-Bacon Act submittals or reviews. Moreover, he denies that he ordered SHA employees to work on Peter Davis's projects while "on SHA time," nor was he aware of such. Finally, he denies that he caused SHA to make full payment on the ADA contracts without completion of the work and adds that full payment was made because the project architect indicated that the work had been completed.

**Paragraph 103**

Mr. Asselin clarifies that John Spano carpeted his basement family room, a staircase, and the hallways of the second and third floors.

**Paragraph 113**

Mr. Asselin denies the allegation in Paragraph 113.

**Paragraphs 123 and 124**

Paragraphs 123 and 124 appear to contradict one another. For example, Paragraph 123 states "Oak Pond Farms, Inc. in turn sub-contracted the architectural and engineering services to Reinhardt Associates, a local architectural firm." Yet Paragraph 124 states that Reinhardt Associates "had no knowledge of either the entity [Oak Pond Farms, Inc.] or the person [William Pappas] and stated that they worked with neither."

**Paragraph 131**

Mr. Asselin denies that he authorized giving Donato Rizzolo an office at SHA.

**Paragraph 167**

Mr. Asselin clarifies that when he said "thank you" and "keep up the good work" to Frank Ware, he was thanking him for buying drinks and referring to the work Ware did as a minority business owner.

**Paragraph 169**

Mr. Asselin denies that, when reading off bids, he "always started with competitors first and finished with G & R or MPH." Rather, he read off bids in alphabetical order. He also denies that, after he read the bids, he gave them to Sotirion; rather, he gave them to SHA's in-house counsel or his secretary.

**Paragraph 172**

Mr. Asselin adds that he awarded the contract to Mr. Ware only after Mr. Ware's proposal was reviewed by SHA's Assistant Director of Management and/or the Management Commitment, who, in turn, made a recommendation to approve the proposal.

**Paragraph 186**

Mr. Asselin denies the allegations in Paragraph 186.

**Paragraph 195**

Mr. Asselin denies that Mr. Maroney spent approximately 10 hours per week doing errands for the Asselin family. Mr. Maroney spent approximately 1 hour per week doing such.

**Paragraphs 196 and 197**

Mr. Asselin adds that, in many instances, he gave Mr. Maroney cash to purchase items.

**Paragraph 198**

Mr. Asselin denies that "many of these items [*e.g.*, paint charts] were not intended for SHA because SHA did not use particular colors of paints or types of wallpaper." In fact, SHA used a wide variety of colors and wallpaper in family residences and in its offices.

**Paragraph 212**

To Mr. Asselin's knowledge, Ann Asselin had no occasion to review any SHA invoices.

**Paragraph 219**

Mr. Asselin denies that Frank Higginbotham performed work at his residence "on SHA time" or that he missed significant periods of work doing such. Higginbotham was absent from SHA for periods of time, but it was because he had cancer. Although Higginbotham did do work for the Asselins, he did so on his own personal time, and Mr. Asselin paid him for his work.

**Paragraph 220**

Mr. Asselin denies that he instructed Cliff Jorgenson to perform roofing work on Christopher Asselin's home "on SHA time" and has no knowledge of such work being performed at all.

**Paragraph 226**

Mr. Asselin denies the allegations in Paragraph 226.

**Paragraph 227**

Mr. Asselin denies that he "skimmed" quarters from SHA coin-operated laundry facilities and had no knowledge of Sotirion doing such.

**Paragraph 229**

Mr. Asselin clarifies that William Pappas routinely gathered cash contributions, all $50 or less, from others and then gave those contributions, in a lump sum, to James or Janet Asselin.

**Paragraph 235**

Mr. Asselin denies that he instructed SHA staff to build signs for Christopher Asselin's campaign while "on SHA time." Those SHA staff members who made signs did so on their own personal time and their work was listed as in-kind contributions.

**Paragraph 238**

Mr. Asselin denies that he or anyone else helped Christopher Asselin "buy" the elections in 2000 and 2002.

**Paragraphs 242-253 "Housing/Section 8 Program Fraud"**

Mr. Asselin denies that he improperly ordered SHA staff to house certain applicants or provide Section 8 vouchers to certain applicants without placing them on the appropriate waiting lists and denies that he engaged in any fraudulent conduct with regard to the administration of these programs.

Both programs gave Mr. Asselin, as the director of the SHA, the discretion to move an applicant to the front of the waiting lists in special circumstances, *e.g.*, where the applicant has been the subject of domestic violence or is homeless. The only times that Mr. Asselin moved an applicant to the front of the list or directed someone else to do the same were in these special circumstances.

**Section VI: "Obstruction of Justice Scheme"**

Paragraph B

Mr. Asselin alone was the one who brought the briefcase to Maria Serrazina's house.

Paragraph D

Mr. Asselin denies that Frank Higginbotham built the deck on Raymond Asselin, Jr.'s home for free; Mr. Asselin paid Higginbotham for the work.

Paragraph E

Mr. Asselin denies that he instructed Satch Melikian "to destroy a list containing names of residents housed improperly and names of political figures who had asked Asselin, Sr. to obtain housing assistance on their behalf."

**Paragraph 268**

Mr. Asselin denies that he had a conversation with Raymond Asselin, Jr. and Christopher Asselin "during which they discussed how they could explain the cash as gambling winnings belonging to Maria Serrazina's deceased husband."

**Paragraph 273: Amount of Loss**

The Bribery Scheme

The PSR states that the loss attributable to the bribery scheme is $2,664,141. In its statement of facts, however, the prosecution alleges that the appropriate measure of loss under U.S.S.G. Sec. 2B1.1 is between $1,000,000 and $2,500,000. Thus, Mr. Asselin objects to the loss calculation insofar as it exceeds $2,500,000.

The Theft Scheme

The PSR adopts the loss figure submitted by the prosecution, $322,172. That figure includes the value of the stolen quarters and the "wages paid to Maroney while performing personal work for Asselin, Sr. and Sotirion," which allegedly amounted to $100,000. As for the stolen quarters, as stated above, Mr. Asselin denies that he had any role in that scheme or that he was even aware of it. As for Maroney's wages, as stated above, Mr. Asselin denies that Mr. Maroney spent more than one hour per week doing work for the Asselin family.

The Section 8 Program Fraud

As stated above, Mr. Asselin denies that there were any improprieties in the administration of the Section 8 and public housing programs and, as such, there is no loss. Even if the prosecution was able to establish wrongdoing, its calculation (adopted by the PSR) is erroneous. According to the prosecution, the "loss" to SHA is "the value of the housing assistance fraudulently granted through manipulation of the SHA waiting lists" and totals $3,240,000. Use of that loss figure, however, is erroneous. Indeed, there is no loss to SHA at all because it would have paid the same costs regardless of whether certain applicants were improperly moved to the top of the waiting lists. Moreover, there is no evidence that Mr. Asselin profited from the alleged wrongdoing.

**Calculation of Offense Level - Paragraph 280**

The PSR recommends that the Court apply a two-level adjustment for abuse of trust pursuant to U.S.S.G. Sec. 3B1.3. Application of that adjustment, however, is erroneous.

Because Counts 1 and 2 are RICO counts, as the PSR correctly states, Sec. 2E1.1 applies. Section 2E1.1 provides that the base offense level is the greater of a base offense level 19 or the offense level applicable to the underlying racketeering acts. Here, the offense level for the underlying racketeering acts (bribery) lead to a base offense level higher than 19, thus Sec. 2C1.1 ("Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right") applies.

As the Background explains, Sec. 2C1.1 "applies to a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence his official actions, or to a public official who solicits or accepts such a bribe." (Emphasis added). In other words, in calculating Mr. Asselin's offense level, Sec. 2C1.1 already takes into consideration that he was a public official and therefore, occupied a position of trust. The First Circuit recognized such in *United States v. Butt*, 955 F.2d 77, 89 (1st Cir. 1992)[1]("The base offense level prescribed by the guidelines for a particular crime presumably reflects, or includes, those characteristics considered by

---

[1] In *Butt*, the First Circuit did not explicitly decide the issue present here because "[t]he parties agreed that abuse of public trust was an element of the offense of extortion under color of right, and that the Sec. 3B1.3 adjustment should not be added to the base offense level of ten, under Sec. 2E1.1(a)(2)." *Id.* at 88.

Congress to inhere in the crime at issue. <u>In the case of extortion under color of right [to which Sec. 2C1.1 also applies], abuse of trust would be one such characteristic, since Congress could reasonably have determined that every act of extortion under color of right involves an abuse of public trust.</u>")(emphasis added).

Thus, to avoid double counting this factor in sentencing, the adjustment under Sec. 3B1.3 should not be applied.[2] Indeed, Sec. 2C1.1, Application Note 3 states: "<u>Do not apply Sec. 3B1.3 (Abuse of Position of Trust or Use of Special Skill)</u> ...." except in enumerated circumstances, none of which are found here. (Emphasis added); *see also* U.S.S.G. Sec. 3B1.3 ("This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.")

**Paragraph 287**

Mr. Asselin denies that the unreported income from the rental of the Chatham property totaled $20,000.

**Assets**

The $100,000 in contributions that Mr. Asselin made towards his pension plan should be removed from the list of assets because Mr. Asselin has been told that, due to his conviction in this case, he is no longer entitled to his pension, including his own contributions.

**Cash Flow Analysis**

Please amend the PSR to indicate that Mr. Asselin no longer receives $3282 monthly from his pension for the above stated reason.

If you have any questions, please feel free to contact me.

Sincerely,

*Patricia A. DeJuneas*
Patricia A. DeJuneas

---

[2] Conversely, this adjustment would apply if Mr. Asselin's sentence was calculated under U.S.S.G. Sec. 2E1.1(a)(1)(setting forth a base offense level of 19 for RICO offense) "[b]ecause the RICO statute...can be violated in innumerable ways" and the offense characteristic of abuse of trust is not necessarily inherent in a RICO violation. *See id.* Here, Sec. 2E1.1(a)(1) does not apply because the Guidelines for the underlying racketeering activity provide for an offense level higher than 19.