<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-N-04-30033-MAP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RAYMOND ASSELIN, SR., | ) | |
| | ) | |
| Defendant. | ) | |

<div align="center">

**GOVERNMENT'S SENTENCING MEMORANDUM FOR**
**DEFENDANT RAYMOND ASSELIN, SR.**

</div>

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files the Government's Sentencing Memorandum For Defendant Raymond Asselin, Sr.

The government respectfully submits that the defendant warrants a sentence of 168 months and a fine of $909,547.53. The defendant's request for a non-Guidelines sentence based on the factors set forth in 18 U.S.C. § 3553(a) should be rejected as baseless. See Defendant Raymond Asselin, Sr.'s Sentencing Memo ("Memo") (Docket No. 409).

I.   Background

A.   The Defendant's Offense Conduct

As set forth in far greater detail in the Pre-Sentence Report dated November 3, 2006 and revised February 21, 2007 (the "PSR"), the defendant masterminded a vast and damaging series of crimes

<div align="center">1</div>

centered around his corrupt operation of the Springfield Housing Authority (the "SHA").    As the SHA's Executive Director, the defendant looted the SHA through a longtime pattern of bribery, theft, and fraud.

In particular, the defendant pleaded guilty to the following charges in the Second Superseding Indictment (the "Indictment"): racketeering, in violation of 18 U.S.C. § 1962(c) (Count 1); conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d) (Count 2); and filing a false income tax return, in violation of 26 U.S.C. § 7206(1) (Count 109).

Counts 1 and 2.    In connection with the substantive racketeering and racketeering conspiracy charged in Counts 1 and 2, the defendant presided over the corrupt operation of the SHA as a criminal enterprise.    As the mastermind of these crimes, the defendant:

> was the central figure in the massive conspiracy. The defendant organized, managed, and supervised, at a minimum, the following individuals: Sotirion, Baribeau, Katsounakis, Davis, Spano, Bannick, Pappas, Rizollo, Ware, Bates, Maroney, DeCaro, and others. . . . The RICO offenses lasted ten approximately years; involved close to $2.5 million in bribes; defrauded SHA financially through the most minute of thefts, i.e., quarters, to the most outrageous amounts, i.e., cash bribes totalling $500,000; involved greater than 20 participants; and created a pervasive and systemic culture of corruption that infected all levels and aspects of SHA. Defendant Asselin, Sr. was the architect of the culture of corruption.

PSR ¶ 282 (emphasis added).

Operating the SHA as his personal fiefdom, the defendant virtually pillaged the institution (and its employees and needy tenants) that he was obliged to protect. According to SHA's chief procurement officer, Francis Maroney, the defendant "routinely instructed him to purchase personal items for members of the Asselin and Sotirion families, and then bill those items to SHA." Indeed, Maroney spent approximately 25% of his SHA time on such personal errands. PSR ¶ 195.

Similarly, the defendant dragooned a corps of SHA maintenance workers, including James Hulse, Ray Descoteau, George Williamson, and Cliff Jorgenson, into performing routine home improvement work at the Asselin families' homes. PSR ¶¶ 214-21. The defendant also conscripted SHA's employees into illicitly serving as campaign workers for his son Christopher's political campaigns. PSR ¶ 235.

The defendant's theft was as casual as it was shocking: he often simply sent Maroney "a note through interoffice mail . . . . The note would consist of a handwritten list of items or a newspaper insert from Sears, KMart, Staples, or some other large retailer with a particular item circled." PSR ¶ 196. When the materials arrived, Maroney just dropped them off at the defendant's office or at his home carport. PSR ¶ 197. The defendant's culture of corruption was so entrenched that he saw no shame (let alone personal risk) in

lugging to his car in the SHA parking lot a five-gallon bucketload of quarters stolen from SHA's coin-operated laundry.  PSR ¶ 226.

Likewise, the defendant's looting was as pervasive as it was mundane.  Year after year, from at least 1989, the defendant stole paint, wallpaper, tile, electrical fixtures, lumber, power tools, wet-dry vacuums, snowblowers, ice melt, fertilizer, rakes, snow shovels, picture frames, rolls of film, picnic tables, and other items.  PSR ¶¶ 195, 198-200, 203-04.  In a blatant display of greed, at the beginning of every summer, the defendant ordered Maroney to steal paper plates, paper napkins, plastic cups, and other items that the defendant needed to enjoy himself at his Cape Cod vacation home in Chatham, MA.  PSR ¶ 202.

At home as at the office, the defendant's criminal conduct was an everyday fixture.  To facilitate the theft and defrauding of SHA, the defendant installed a basket next to the rear door of his residence, so that Asselin family members could simply drop in a note specifying the particular work or item that they needed from SHA for their homes.  PSR ¶ 206.  On Sundays, the defendant presided over a virtual family council of corruption, where family members would casually discuss their SHA-funded home improvement projects.  PSR ¶ 207.

In addition to the defendant's widespread looting of the SHA's resources, the defendant also engineered a broad bribery scheme, where he recruited a stable of corrupt contractors who kicked back

for lucrative contracts and rigged bids.  These contractors included the following:  Gary Baribeau, who literally turned over his checkbook to the conspiracy, PSR ¶ 49; Nicholas Katsounakis, who paid hundreds of thousands of dollars in bribes, including checks totaling approximately $190,000 of kickbacks in a 24-hour period, Transcript of Trial at 466-67; Peter Davis, who showered the defendant's sons with payments for home improvements; Paul Bannick, who routinely shorted SHA to generate his bribe payments, PSR ¶ 107; William Pappas, who had non-disclosed business interests with the defendant, PSR ¶¶ 116-19; Donato Rizzolo, who was permitted to keep a fully equipped office at SHA for twenty years, without paying a dime in rent, PSR ¶ 131; Frank Ware, who paid between 10-20 percent of nearly every contact that he obtained, PSR ¶¶ 165-66; and others.

To prevent discovery of his schemes, the defendant (who received personal awards from HUD for the purportedly exceptional operation of SHA) directed his staff "to falsify SHA records sone of the records on which HUD graded SHA's performance . . . .  The net effect of this was that HUD exercised less oversight and ordered fewer audits than they ordinarily would have," thus enabling the defendant's criminal scheme to roll on undetected.  PSR § 32. Finally, when the federal investigation began to bear down on the defendant, he opted for the worst course possible: he repeatedly obstructed justice "by attempting to conceal evidence, counseling [witnesses] to lie, and destroying evidence."  PSR ¶ 276.

Consistent with his role as the mastermind of the racketeering enterprise and conspiracy, the defendant was also a primary beneficiary of the crimes. As specified in Exhibit A, the defendant lined his pockets (and those of his children) with a highly conservative estimate of $909,547.53 in bribe payments or thefts through the following racketeering acts alleged in the Indictment.[1]

Count 109. In connection with the tax fraud charged in Count 109, on or about April 15, 2000, the defendant falsely filed his 1999 federal income tax return (Form 1040) by failing to report substantial additional income received from bribes, stolen vending machine quarters, goods and/or services paid by the SHA, and income from the rental of 56 Stage Island Road, Chatham, MA.

B.    The Defendant's Objections To The PSR

The government respectfully notes that the defendant's objections have no bearing on the defendant's guidelines range or restitution or forfeiture obligations.[2]

However, the government notes that the defendant's self-serving denials reflect poorly on his personal characteristics, 18 U.S.C.

---

[1] Notably, this total omits items obtained solely for Sotirion and Sotirion's family, as well as many unspecified cash bribes and other bribes that could not be quantified. This total also omits substantial and valuable theft such as the labor of SHA employees who provided personal work on SHA time for the defendant and his family members.

[2] The government concedes the defendant's objection to Paragraph 280, which mistakenly provides for a 2-level abuse of trust enhancement pursuant to U.S.S.G. § 3B1.3. Infra at 9.

§ 3553(a)(1), and undermine his claim for acceptance of responsibility. For example, his denial of rigging Nicholas Katsounakis's bid in Paragraph 64 of the PSR is flatly belied by Katsounakis's trial testimony in United States v. Peter Davis, which was corroborated by the kickback ledger drafted by Sotirion. Similarly, his attempt to blame SHA's architect for Peter Davis's failure to complete the ADA-504 project in Paragraph 84 of the PSR is wholly contradicted by the architect's trial testimony, which was amply corroborated by the architect's letters to Sotirion and the defendant.

C.    The Impact On Victims

The actual fraud and loss amounts specified for Counts 1 and 2 understate the seriousness of the offenses because some of the bribery, theft, and fraud could not be calculated with precision. For example, the estimates omit the costs incurred by the stolen time of SHA's employees George Williamson, Betsy Torres, Virma Santiago, and others. To take simply the loss of one employee's time, Torres spent more than a month's work, including overtime, on one of Christopher Asselin's political campaigns. Transcript of Trial, United States v. Peter Davis, Testimony of Betsaida Torres, T. 2009-10.

Moreover, dollar figures simply do not reflect the true harm caused by the defendant. As the SHA Board of Commissioners made clear in its Victim Impact Statement dated November 22, 2006 (the

"Impact Statement"), "[m]any have been victimized and it will take a very long time to recover. . . . [t]he victim impacts have been severe." Impact Statement, at 1, 7. As the Impact Statement demonstrates, the loss figure attributed to any one defendant simply cannot capture the full extent of the harm caused by the defendants' crimes. The defendants' crimes "have broken that essential trust with tenants, vendors, federal and state funding sources, and the general public." Id. at 2. Such damage to the public trust is, literally, incalculable.

As one concrete example of this intangible harm, SHA lost its classification as a high-performing agency, which in turn resulted in the loss of essential federal funds. Id. at 3. In order to regain this valuable status and bring the SHA back to even keel, SHA had to devote "[t]housands of hours of time." The Board attests that "[i]t would take a forensic accountant to put a true dollar value on the effort," which cost an estimated "hundreds of thousands of dollars in time and talent." Id. at 3. Moreover, when SHA fails to obtain funding because of its criminal past, "the victims are the seniors and the disabled individuals who are the intended beneficiary" of the funds. Id. at 4.

Further, as many of SHA's buildings are "nearing functional obsolesence," the greed of the defendant, who pillaged the SHA to beautify his family homes, including a luxury home on Cape Cod, stands in stark relief. Id. at 5. In sum, as the SHA Board

8

recognized, "the totality of the corruption is jaw-dropping." Id. at 6-7.

II.    The Defendant Merits A Sentence Of 168 Months

    A.    The Defendant Deserves A Two-Level Upward Departure

    The government agrees with defense counsel that the defendant is technically ineligible for a two-level enhancement for his abuse of position of trust, pursuant to U.S.S.G. §§ 1B1.5(c), 3B1.3, and 3C1.1.[3] However, the government respectfully submits that the Court should apply a two-level upward departure pursuant to Application Note 5 of Section 2C1.1, which states: "Where the court finds that the defendant's conduct was part of a systemic or pervasive corruption of a governmental function, process or office that may cause loss of public confidence in government, an upward departure may be warranted." U.S.S.G. § 3C1.1, Commentary, Application Note 5; see also U.S.S.G. § 5K2.7 (authorizing upward departure "to reflect the nature and extent of the disruption [of a governmental function] and the importance of the governmental function affected.").[4] As the 11th Circuit explained in approving a five-level departure under Application Note 5, "a departure based on

_____

    [3]  In the Plea Agreement, the government stated it would argue for the two-level increase pursuant to U.S.S.G. § 3B1.3.  Plea Agreement, ¶ 3C.  The government now agrees that such an enhancement would constitute double-counting.

    [4]  Commentary like Application Note 5 is authoritative unless it violates the Constitution or a federal statute, or is an inconsistent or plainly erroneous reading of the guideline.  See Stinson v. United States, 508 U.S. 36, 41-46 (1993).

9

systemic corruption and massive loss of public confidence furthers the objectives of the guidelines." United States v. Shenberg, 89 F.3d 1461, 1477 (11th Cir. 1996).

Here, the defendant's conduct was not simply "part of," but rather the core of, "a systemic or pervasive corruption." Application Note 5. As the PSR emphasized, the defendant:

> was the central figure in the massive conspiracy. . . . The RICO offenses lasted ten approximately years; involved close to $2.5 million in bribes; defrauded SHA financially through the most minute of thefts, i.e., quarters, to the most outrageous amounts, i.e., cash bribes totaling $500,000; involved greater than 20 participants; and created a pervasive and systemic culture of corruption that infected all levels and aspects of SHA. Defendant Asselin, Sr. was the architect of the culture of corruption.

PSR ¶ 282 (emphasis added).

Moreover, although Application Note 5 "do[es] not require a showing of actual public harm," Shenberg, 89 F.3d at 1476, the defendant's corruption did in fact cause loss of public confidence in the SHA. As the SHA's Impact Statement states, "[t]he defendants' crimes "have broken that essential trust with tenants, vendors, federal and state funding sources, and the general public." Impact Statement, at 2.

As this Court recognized during the sentencing of Arthur Sotirion on February 5, 2007, the defendant presided over a pervasive, systemic corruption of the SHA that was so well

entrenched that "nobody . . . did anything to stop it or report it
to others."  This Court emphasized:

> All of us who live in western Massachusetts
> are rightly appalled by the opportunism of the
> Springfield Housing Authority conspiracy and
> the   reaction   is   entirely   proper   and
> understandable. The behavior of Mr. Sotirion,
> I think he know recognizes, as well as Raymond
> Asselin, Sr. and the other conspirators,
> deserves  to  be  condemned  and  severely
> punished.  This  will  be  a  severe,  severe
> punishment.  . . . What has impressed me in
> this case is how many people from all over
> western Massachusetts were aware of what was
> going on at the Springfield Housing Authority
> for years, maybe decades. Nobody, as far as
> the evidence now shows, did anything to stop
> it or report it to others who could have
> stopped it.  This criminality at the SHA
> continued to a large extent because it was
> permitted to continue. . . .

Given the defendant's "central" role in creating the "pervasive
and systemic culture of corruption that infected all levels and
aspects of SHA," PSR ¶ 282, the upward departure is warranted.
Courts have routinely imposed and affirmed such departures.  See,
e.g., Shenberg, 89 F.3d 1461 (approving five-level departure);
United States v. Reyes, 239 F.3d 722, 744-45 (5th Cir. 2001)
(affirming two-level departure); United States v. Hernandez, 251
F.3d 1247, 1249-50 (9th Cir. 2001) (noting two-level departure);
United States v. Saadey, 393 F.3d 669, 680-81 (6th Cir. 2005)
(approving one-level departure); United States v. Gutman, 95
F.Supp.2d 1337, 1349-52 (S.D. Fla. 2000) (departure based upon
"extraordinary obstruction of justice" and "flagrant breach of

public trust"); <u>United States v. Carroll</u>, 00-CR-195-2, 2002 W.L.
1332795 *10-11 (N.D. Ill. June 17, 2002) (imposing two-level upward
departure) (citing cases), <u>vacated</u>, 346 F.3d 744 (7th Cir. 2003);
<u>United States v. Paulus</u>, 331 F.Supp.2d 727, 738 (E.D. Wisc. 2004)
(basing six-level increase primarily upon pervasive corruption).

    B.   <u>The Defendant's Advisory Guidelines Range</u>

Assuming a two-level upward departure for the defendant's
pervasive corruption of the SHA, the defendant faces an advisory
guidelines range of 135-168 months, based upon Offense Level 33 and
Criminal History Category I.  The government respectfully recommends
that the Court impose the maximum sentence at this range.  As the
court in <u>Paulus</u> reasoned:

> On the question of where within this range the
> defendant's sentence should fall, the court is
> guided by the severity of the offense, the
> impact of the crime upon the public, and the
> need to send a strong message that such
> conduct by public officials will not be
> tolerated.

331 F.Supp.2d at 738.

In the event that the Court declines to depart upward, the
government respectfully recommends that the Court sentence the
defendant to the top of the range specified in the revised PSR,
which would be 135 months based upon Offense Level 31 and Criminal
History Category I.  <u>See</u> <u>United States v. Ganim</u>, 03-CR-263 (JBA),
2006 W.L. 1210984 *1 (D. Conn. May 5, 2006) (noting that public

corruption defendant "was sentenced at the top of the range, reflecting Application Note 5 to U.S.S.G. § 2C1.1.")

    C.   <u>The Defendant Warrants A Guidelines Sentence</u>

The government respectfully submits that the defendant's request for a lenient, non-guidelines sentence is baseless. To the contrary, the factors set forth in 18 U.S.C. § 3553(a) all warrant no reduction from the guidelines range.

    1.   <u>Nature And Circumstances Of The Offense</u>

The nature and circumstances of the offense warrant a Guidelines sentence. As set forth above, the defendant not only committed, but orchestrated, an astonishing range of bribery, theft, and fraud. The defendant also repeatedly obstructed justice "by attempting to conceal evidence, counseling [witnesses] to lie, and destroying evidence." PSR ¶ 276.

Given the seriousness of the underlying offenses and the defendant's central role, the nature and circumstances of the offense require a Guidelines sentence. <u>See</u> 18 U.S.C. § 3553(a)(1).

    2.   <u>The Defendant's History And Characteristics Warrant A Guidelines Sentence</u>

The personal characteristics of the defendant weigh in favor of a Guidelines sentence. Unlike most defendants who come before this Court, the defendant has enjoyed a life of rare privilege and affluence, and had absolutely no financial need to commit his crimes.

He was raised in "an emotionally and economically secure environment" in his family's home in Chicopee, MA.  PSR ¶ 306.  The defendant's owned a farm and the defendant attended a private boarding school.  Id.  In short order, the defendant received a bachelor's degree, got married, and then purchased two residences, including a summer home on Cape Cod.  PSR ¶¶ 311-12.  In 1993, the defendant and his siblings inherited two commercial buildings in Chicopee.  PSR ¶ 312.

The defendant has enjoyed excellent physical health and currently takes medication only for high blood pressure, cholesterol, and relatively mild mental health issues such as anxiety.  PSR ¶¶ 315-16.  The defendant has no drug or alcohol addictions.  PSR ¶ 317.

As the defendant concedes, he is embraced by a broad network of family who remain "close-knit" in spite of the instant prosecution.  Memo, at 7.  During the defendant's offenses, he was gainfully employed in a position of authority that yielded him a respectable income.  PSR ¶ 319.  In addition to the defendant's two residences, he also owns two vehicles and a boat.  He currently has a net worth of approximately $4.1 million; even subtracting the assets that the defendant will be forfeiting, he still has a net worth of approaching $1 million, much of which is contained within bank or investment accounts.  PSR ¶ 321.

In sum, the defendant's life reveals no extenuating circumstances that might have motivated him to commit his crimes. Instead, as an educated person of relative affluence, the defendant well knew right from wrong and had absolutely no financial need to commit the crime. Thus, it appears that only his naked arrogance and greed motivated him to commit his crimes. As a result, his personal circumstances aggravate, rather than mitigate, the seriousness of his crimes. At the very least, his history and characteristics warrant a Guidelines sentence. See 18 U.S.C. § 3553(a)(1).

The defendant seeks a lower sentence based upon his age, professional accomplishments, good works, and family circumstance. As set forth below, none of these factors, in combination or alone, warrants any reduction from the guidelines range.

a.  The Defendant's Age And Health Do
Not Merit Any Sentence Reduction

The defendant's age "is not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. §5H1.1 (Policy Statement). Although the Guidelines contemplate a departure where a defendant is "elderly and infirm," the defendant here is in relatively good health. The First Circuit has repeatedly rejected downward departures based upon age, even where a defendant is facing a far longer period of incarceration. See United States v. Jackson, 30 F.3d 199 (1st Cir. 1994) (rejecting departure from 27-year guidelines sentence for 40-year old defendant); United States v.

15

Doe, 921 F.2d 340 (1st Cir. 1990) (affirming 30-year sentence on 50-year old defendant).

Moreover, although the defendant's age may mean that, statistically, he is less likely than a younger person to commit another crime, such statistics melt away in the face of the facts of this offense, where the defendant spent a great part of his many years at SHA engaged in crime.  Thus, the defendant's broad, pervasive, and chronic misconduct suggests that his age does not relate to his recidivist tendencies to justify a non-Guidelines sentence.

Lastly, the defendant is in relatively good health, suffering only from common complaints like hypertension, high cholesterol, and stress.

<div style="text-align:center">

b.   The Defendant's Work At SHA Does
Not Merit Any Sentence Reduction

</div>

Second, the defendant's professional accomplishments have no bearing on the defendant's sentence.  As an initial matter, the record hardly indicates that the defendant "served the SHA with distinction."  Memo, at 5.  To the contrary, the awards that SHA and/or the defendant received during his tenure were obtained in part through fraud.  See PSR ¶ 32.

Moreover, the defendant should hardly receive a sentencing benefit for doing his job, particularly since he so corrupted the institution he led.  As the court in Gamin reasoned, such accomplishments:

<div style="text-align:center">16</div>

should be given a lesser weight in the context
of a top elected municipal official who
criminally and shamelessly flouts his lawful
authority and the public trust. [The
defendant] was convicted of corrupting the
very public office he used for the good works
for which he now claims credit. While he may
take credit for at least a portion of
Bridgeport's economic turnaround while he was
its chief executive, even more money and
opportunity potentially would have been
available for the public's benefit had the
defendant not been getting kickbacks from city
contracts and had he not awarded the contracts
to and through his co-conspirators rather than
permitting a genuine competitive bidding
process. [The defendant] used his power as
mayor both for city improvements and for
racketeering, extortion, and fraud, and
positive results do not counterbalance his
crimes.

2006 W.L. 1210984 *3.

> c.   The Defendant's Other Good Works
>      <u>Do Not Merit Any Sentence Reduction</u>

Similarly, the defendant's non-SHA related good works at the United Way and the North End Community Council (the "NECC") do not warrant a sentence reduction. The defendant's good works are ordinarily not relevant to determining whether the defendant should receive a departure from the applicable Guidelines range. <u>See</u> U.S.S.G. § 5H1.11.

Courts generally recognize that the charitable and civic deeds of affluent or professionally successful individuals, such as the defendant in this case, do not normally render their good works sufficiently unusual or exceptional to warrant a downward departure. <u>See</u>, <u>e.g.</u>, <u>United States v. Thurston</u>, 358 F.3d 51, 80-81 (1st Cir.

2004); <u>United States v. Crouse</u>, 145 F.3d 786, 788 (6th Cir. 1998);

<u>United States v. Kolhbach</u>, 38 F.3d 832, 839 (6th Cir. 1994); <u>United

States v. Haversat</u>, 22 F.3d 790, 796 (8th Cir. 1994).

As the First Circuit explained:

> It is hardly surprising that a corporate
> executive like Thurston is better situated to
> make large financial contributions than someone
> for whom the expenses of day-to-day life are more
> pressing; indeed, business leaders are often
> expected, by virtue of their positions, to engage
> in civic and charitable activities. Those who
> donate large sums because they can should not
> gain an advantage over those who do not make such
> donations because they cannot.

<u>Thurston</u>, 358 F.3d at 80.

Here, the defendant's self-serving, uncorroborated,
descriptions of his contributions to the United Way and the NECC are
somewhat sketchy. Memo. at 8. In any event, it is clear that the
defendant, who generated millions of dollars of graft, had placed
himself in a position to be unusually generous, either his time or
his money. For example, the defendant could well afford to donate
his time or money to the United Way and NECC, when he did not have
to spend any time shopping for home improvement supplies or working
at home improvement projects, much less paying for these goods and
services.

Indeed, the defendant's involvement in civic organizations may
actually be more self-serving than selfless, to the extent that it
cast him in a positive, law-abiding light. "At the very minimum,

18

therefore, goodwill accrued to the defendant from his community activities." United States v. Scheiner, 873 F. Supp. 927, 934, n.7 (E.D. Pa. 1995).

The defendant's prior service, even taken in its most favorable light, simply does not warrant any adjustment from the advisory Guidelines range, particularly in view of his professional success and considerable assets, as well as the nature of his offense. See Thurston, 358 F.3d at 79-81 (reversing downward departure) Barbera, 2004 WL 2403868 at *12 (rejecting request for downward departure despite defendant's extensive fundraising and service on boards of various community and civic organizations); United States v. Scheiner, 873 F. Supp. at 934 (rejecting request for downward departure despite defendant's sponsorship of basketball teams, service at a free medical clinic, and community board activity).

>           d.   The Defendant's Family Circumstances
>                Do Not Merit Any Sentence Reduction

Shamelessly, the defendant seeks to mitigate his own punishment by claiming that he has suffered from seeing his wife and children face criminal charges and/or incarceration. However, these are his co-conspirators, all of whom shared in the fruits of the defendant's crimes. The defendant should not be afforded a reduced sentence by relying upon family circumstances entirely of his own making.

### 3.   The Need for the Sentence Imposed

A Guidelines sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

Here, the defendant participated in offenses that gravely harmed the SHA and its needy tenants, its contractors, and its administrators, and then demonstrated blatant disrespect for the law by repeatedly obstructing the investigation into these crimes.

In this case, where the defendant participated in a series of crimes marked by naked greed and brazen disrespect for the law, only a Guidelines sentence will promote "respect for the law" and "provide just punishment." 18 U.S.C. § 3553(a)(2)(A).  Moreover, a Guidelines sentence would provide general deterrence for others similarly situated in society.  See 18 U.S.C. § 3553(a)(2)(B).

### D.   Restitution

As contemplated by Paragraph 6 of the Plea Agreement, the defendant has or will transfer to the United States the cash equivalent of his Springfield, MA home; his Cape Code home; approximately $243,650 in cash that was seized during the investigation; his 2002 BMW vehicle; and his twenty-three foot Chaparral pleasure boat.  These properties will then be transferred to, or sold for, the benefit of the SHA.

The Plea Agreement specifies that "[t]he transfer of assets for restitution set forth herein shall <u>not satisfy or offset any fine, cost of imprisonment, or other penalty imposed upon Defendant</u>, except as set forth in this paragraph, nor shall the transfer of assets for restitution be used to offset Defendant's tax liability or any other debt owed to the United States." Plea Agreement, ¶ 6, at page 7 (emphasis added). Thus, the defendant's tender of restitution does <u>not</u> offset any fine that the Court may impose.

E.   <u>Fine</u>

The government respectfully requests that the Court impose a fine of $909,547.53, constituting the government's conservative estimate of the amount of gross profit or gain that the defendant derived from his crimes. <u>See</u> Exhibit A.

The defendant's advisory guideline fine range is $17,500 to $175,000 or twice the value of the proceeds of the offense. PSR ¶ 336; <u>see also</u> U.S.S.G. §5E1.2, Commentary, Application Notes 2 and 4; 18 U.S.C. § 3571(d) (authorizing a fine of "not more than the greater of twice the gross gain or twice the gross loss"); 18 U.S.C. § 1963(c) (authorizing a fine "not more than twice the gross profits or other proceeds").

Here, the defendant himself received, at a bare minimum, gross profits or gain of $909,547.53 for the direct benefit of himself or his family members. Notably, this amount omits many unspecified

cash bribes and other bribes that could not be quantified, and substantial theft such as the labor of SHA employees who provided personal work on SHA time for the defendant and his family members. Thus, the amount of $909,547.53 is a highly conservative estimate of the defendant's gross gain or profit, and certainly understates the gross loss attributable to the defendant.

Thus, the Court should impose a fine of $909,547.53. Such a fine signals to this defendant, the general public, and others tempted to engage in corrupt behavior, that crime does not pay.

III. <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court impose a sentence of 168 months and a fine of $909,547.53.

Filed this 23rd day of February, 2007.

<div style="margin-left: 40%;">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


     /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney

</div>

CERTIFICATE OF SERVICE

Hampden,  ss.                          Springfield, Massachusetts
                                       February 23, 2007


        I,  Steven  H.  Breslow,  Assistant  U.S.  Attorney,  do  hereby
certify that I have served a copy of the foregoing by electronically
filing said motion to:


Richard Egbert, Esq.
99 Summer Street
Boston, MA 02110
Counsel for defendant Arthur Sotirion


                          /s/ Steven H. Breslow
                        STEVEN H. BRESLOW
                        Assistant United States Attorney